UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| FAITH INTERNATIONAL ADOPTIONS, et al, | CASE NO. 2:18-cv-00731-RBL |
| Plaintiff, | ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION |
| v. | |
| MICHAEL R. POMPEO, et al, | |
| Defendant. | |

## INTRODUCTION

THIS MATTER is before the Court on Plaintiffs Faith International Adoptions, Amazing Grace Adoptions, and Adopt Abroad Incorporated's (collectively "Faith") motion for preliminary injunction. Dkt. #20. Since 2008, all three Plaintiffs have been accredited to help families navigate the legal and logistical requirements for international adoption. Plaintiffs have renewed their accreditation multiple times and applied in 2017 to do so again. However, the Council on Accreditation (COA), the entity tasked with processing accreditation applications, deferred its final decision past March 31, 2018, the expiration date of Plaintiffs' most recent accreditation. When COA informed State of this, State instructed COA that it could not continue to process the applications after expiration and that Plaintiffs' renewals would effectively be

refused. COA reluctantly complied with this directive, causing Plaintiffs to lose accreditation and face the prospect of re-applying as new applicants, a process that could take over a year to complete. Instead of taking this route, Plaintiffs now seek an injunction suspending the effect of State's directive.

Faith argues that it is likely to succeed in its claims because State's directive was unlawful on several grounds. First, Faith contends that State's directive COA constituted an arbitrary and capricious shift in policy in violation of the Administrative Procedure Act. Second, Faith also argues that the directive amounts to a substantive rule that required notice-and-comment procedures, which State did not implement. Finally, Faith asserts that State's directive violated the Intercountry Adoption Act (IAA) because State did not follow the required procedures for cancelling, debarring, or refusing to renew an agency's accreditation.

Boiled down, State's response is that it did nothing at all. State contends that it was COA that refused to renew Faith, and that State's directive was not a "final agency action" under the APA because it merely served to clarify existing regulations. State also denies that it ever had knowledge of COA's practice of deferring some renewal decisions past the date of expiration, so there was no arbitrary and capricious policy change. Finally, State argues that its directive did not violate the IAA because State's interpretation of the regulations merely tracked the plain text.

Faith also contends that it is likely to suffer irreparable harm if the Court does not grant an injunction because, without accreditation, Faith will continue to lose money and may soon face bankruptcy. Furthermore, Faith argues that the equities tip sharply in its favor and an injunction would be in the public interest. State contests these assertions largely on the basis that Faith declined the opportunity to re-apply as a new applicant and has not demonstrated that its loss of accreditation has had an appreciable effect on adoptees or prospective families.

1    This is a time sensitive matter. At the end of the year, COA will cease to operate as an

2    accrediting entity, rendering it incapable of reaching a final decision on Plaintiffs' renewal

3    applications. Whether an injunction is granted or not, this case will soon become moot either

4    because COA will have finished processing the renewal applications or will lack sufficient time

5    to do so.

6                                    **BACKGROUND**

7    **A.    The Intercountry Adoption Act Regulatory Framework**

8        The Hague Convention on Protection of Children and Cooperation in Respect of

9    Intercountry Adoption standardized adoptions between signatory nations. Congress passed the

10   Intercountry Adoption Act of 2000 to implement those standards domestically. 42 U.S.C. §§

11   14901-954. The IAA imposes requirements and grants authority to several different parties,

12   including the U.S. Department of State, private "accrediting entities" (AEs), and adoption

13   agencies themselves.

14       State has some direct obligations under the IAA. For example, State is required to

15   monitor the performance of AEs and may suspend or cancel an AE's designation for

16   noncompliance. § 14924(a). State is also charged with promulgating regulations prescribing rules

17   that AEs must follow when determining whether an agency should be accredited. *See* § 14923.

18   State may also suspend, cancel, or debar an adoption agency itself if it is substantially out of

19   compliance with applicable standards. § 14924(b) & (c).

20       However, the IAA also grants some authority to AEs. Once State has entered into an

21   agreement with an AE, the AE is charged with processing the accreditation of agencies,

22   overseeing their compliance, and taking adverse action when an agency is out of compliance.

23

24

§ 14922(a) & (b). An agency may appeal to have an adverse action set aside by the AE or petition a U.S. District Court for such relief. § 14922(c).

Pursuant to its authority under § 14923, State has promulgated regulations governing the activities of AEs and adoption agencies. *See* 22. C.F.R. § 96. Section 96.63, which governs renewal of an agency's accreditation, is the main focus of this case. The relevant portions read as follows:

(a) The accrediting entity must advise accredited agencies and approved persons that it monitors of the date by which they should seek renewal of their accreditation or approval so that the renewal process can reasonably be completed prior to the expiration of the agency's or person's current accreditation or approval. . . .

(b) . . .

(c) The accrediting entity must process the request for renewal in a timely fashion. Before deciding whether to renew the accreditation or approval of an agency or person, the accrediting entity may, in its discretion, advise the agency or person of any deficiencies that may hinder or prevent its renewal and defer a decision to allow the agency or person to correct the deficiencies. The accrediting entity must notify the accredited agency, approved person, and the Secretary in writing when it renews or refuses to renew an agency's or person's accreditation or approval.

(d) Sections 96.24, 96.25, and 96.26, which relate to evaluation procedures and to requests for and use of information, and § 96.27, which relates to the substantive criteria for evaluating applicants for accreditation or approval, other than § 96.27(e), will govern determinations about whether to renew accreditation or approval. . . .

**B.     Factual Background**

Faith International Adoptions, Amazing Grace Adoptions, and Adopt Abroad Incorporated all received Hague accreditation in 2008. Motion, Dkt. #20, at 3. All three agencies had their accreditation renewed at least once after that time, and were due to have their accreditation expire on March 31, 2018. *Id*. at 3-4. All three also applied in 2017 to have their accreditation renewed. *Id*. at 4.

For years, the sole entity providing accreditation services under the IAA was COA. *Id*. at 1. However, in August of 2017, State designated a second AE: the Intercountry Adoption Accreditation and Maintenance Entity, Inc. (IAAME). *Id*. at 4. Shortly thereafter, COA announced that it planned to withdraw, leaving IAAME as the only AE. *Id*. The parties organized a transitional arrangement under which IAAME would handle all new applications in 2018, as well as renewal applications for agencies "seeking renewal in 2019 or later."[1] *Id*. COA, however, would continue to process renewal applications filed before the start of 2018.[2] *Id*. By the end of 2018, COA will cease operations and IAAME will take over as the sole AE. *Id*.

Because the Plaintiffs applied for renewal in 2018, their applications were handled by COA. *Id*. On March 28, 2018, COA emailed State to update it on the status of these applications. Olson Decl., Dkt. #51, Ex. L, at 5-6. COA informed State that it had requested additional information from the agencies and had deferred its final decision. *Id*. Consequently, COA would likely not grant or refuse Plaintiffs' renewals before the agencies' current accreditation expired. *Id*.

After being prodded for a reply, State responded to COA's email on March 30 and informed it that, "[a]fter March 31, COA may no longer continue to review or make any decision in relation to [Faith's] accreditation application." *Id*. at 4. The email also stated that "any corrective action would be moot as of the expiration date." *Id*. COA responded with confusion about State's directive and concern for its clients, stating that COA had always continued processing an agency's renewal if a decision could not be reached before accreditation expired.

---

[1] U.S. Dep't of State – Bureau of Consular Affairs, *Adoption Notice: FAQ: Newly Designated Accreditting Entity, IAAME*, (Aug. 25, 2017), https://travel.state.gov/content/travel/en/News/Intercountry-Adoption-News/faq-on-the-accrediting-entity-transition.html (last visited Oct. 26, 2018).

[2] *Id*.

*Id.* at 2. State replied by reiterating its decision and further explaining its interpretation of the regulations:

> We write to correct your mistaken impression that the Department is requiring a "different procedure."
>
> Where the ASP has a renewal application that is pending with the AE and the AE allows an ASP's accreditation/approval to expire, the AE's decision to allow the expiration of accreditation/approval because the ASP was unable to demonstrate substantial compliance prior to its expiration date constitutes a refusal to renew pursuant to 22 CFR Part 96.63(c) and 96.77(c). Under the Regulations and COA's Policies and Procedures, which the Department approved, and as you acknowledge below, at that point the ASP becomes a "new applicant" for accreditation. Under the transition plan, COA no longer has jurisdiction to accept new applications, and therefore likewise lacks jurisdiction to "convert" the ASP to a "new applicant".

*Id.* at 1.

On April 2, State issued an Adoption Notice stating that Plaintiffs' renewal applications had been refused.[3] Although COA complied with State's directive, COA insists that it has deferred renewals in a similar way in the past and that State was well aware of this practice and never objected. Schmidt Decl., Dkt. #47, at 1-3, Exs. A & B. COA also states that it is willing to finish processing Faith's renewal if State allows it to, and estimates that this would take 45 to 60 days. *Id.* at 6.

In the meantime, Faith has been losing money since it became non-accredited and bankruptcy may be on the horizon. Meske Decl., Dkt. #21, at 4; *see also* Kinley-Albers Decl., Dkt. #22, at 4-5; Kinton Decl., Dkt. # 23, at 4. Faith filed this action against COA and State on May 18, 2018. Dkt. #1. However, after COA denied that it willingly refused Faith's application, Faith stipulated to COA's dismissal from the case. Dkt. #48. This leaves State as the sole defendant and potential subject of an injunction.

---

[3] U.S. Dep't of State – Bureau of Consular Affairs, *Adoption Notice: Accreditation Renewal Refusal for Amazing Grace Adoptions, Adopt Abroad International, and Faith International Adoption, Inc.* (Apr. 2, 2018), https://travel.state.gov/content/travel/en/News/Intercountry-Adoption-News/adoption-notice--accreditation-renewal-refusal-for-amazing-grace.html (last visited Oct. 26, 2018).

## DISCUSSION

### A.    Legal Standard

For a court to grant a preliminary injunction, the plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The last two factors merge if the government is a party. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). When considering whether to grant this "extraordinary remedy, . . . courts must balance the competing claims of injury and consider the effect of granting or withholding the requested relief, paying particular regard to the public consequences." *Winter*, 555 U.S. at 24.

The Ninth Circuit applies a "sliding scale" approach to preliminary injunctions where "a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). For example, "a preliminary injunction could issue where the likelihood of success is such that 'serious questions going to the merits were raised and the balance of hardships tips sharply in [plaintiff's] favor.'" *Id.* (quoting *Clear Channel Outdoor, Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir.2003)).

### B.    Likelihood of Success on the Merits/Serious Questions going to the Merits

*1.    Did the Directive Constitute a Final Agency Action?*

State argues that it never took any discrete action that could be challenged under the APA. According to State, its emails to COA on March 30, 2018, did not announce any new policy. Instead, State's position is that COA "bore the sole responsibility for applying the regulations" and refused Faith's application pursuant to that authority. Dkt. #51, at 7. State's

emails "merely clarified the regulatory rules for renewal" and "described the effect of [COA's] non-renewal under the regulations." *Id*.

Faith does not view State's actions in such benign terms. According to Faith, "the sole action resulting in COA's inability to complete its review . . . was the State Department's act of issuing its Directive." Dkt. # 54, at 7. Faith points to COA's own statement that it intended to complete the review process and only terminated its review after receiving the directive from State. *See* COA Response, Dkt #35, at 1; Schmidt Decl., Dkt. #47, at ¶5. As a result of this, Faith became unable to perform Hague adoptions.

Under the APA, only a "final agency action for which there is no other adequate remedy in a court" may trigger judicial review under the statute. 5 U.S.C. § 704. An "agency action includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). The Supreme Court has long taken a "pragmatic approach" to finality. *U.S. Army Corps of Engineers v. Hawkes Co.*, 136 S. Ct. 1807, 1815 (2016) (citing *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967)). In *Abbott Laboratories*, for example, the Court found a final action where the regulations were "definitive" statements of the Commission's position that had a "direct and immediate . . . effect on the [complaining parties'] day-to-day business," and "immediate compliance with their terms were expected." 387 U.S. at 149 (1967); *see also Frozen Food Express v. United States*, 351 U.S. 40 (1956) (finding a final agency action where the Commission merely gave notice of its interpretation of the statute and had not brought any action based on that interpretation).

In *Bennett v. Spear*, the Supreme Court "distilled from [its] precedents two conditions that generally must be satisfied for agency action to be 'final' under the APA." *Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016). "First, the action must mark the consummation of the agency's

decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).

Applying the conditions from *Bennett* and the Court's emphasis on pragmatism, State's March 30 emails to COA likely qualify as a final agency action. Regarding the first prong of *Bennett*, the question is whether State's "clarification" of its regulations constituted an interpretive shift that was the final result of the agency's decision-making process. Dkt. #51, at 7; *see Frozen Food Express*, 351 U.S. 40, 43-44 (1956); *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2123 (2016) (finding a final rule arbitrary and capricious for its unexplained departure from a prior interpretation). Faith presents some persuasive evidence that State's interpretation does amount to such a shift. In an April 11, 2016, email, COA provided a detailed explanation of its accreditation renewal process to State's Office of Children's Issues. Schmidt Decl., Dkt. #47, Ex. A. That email clearly describes COA's practice of granting deferrals extending the review process past an agency's accreditation expiration date. *Id.* State responded to this email a day later with a brief acknowledgement and thank you. *Id.* There is also a March 30, 2016, email from State specifically recognizing that one adoption agency would experience a two week lapse in accreditation before COA could make a final decision regarding renewal. *Id.*, Ex. B. These communications indicate that State formerly interpreted its regulations to allow AEs to defer decision on renewal past an agency's accreditation.

State's March 30, 2018, correspondence with COA mark a distinct change. In several emails, State definitively asserts that 22 C.F.R. §§ 96.63(c) and 96.77(c) prohibit an accrediting entity from processing renewals past the expiration of accreditation. *See* Olson Decl., Dkt. #51,

Ex. L. Although State claims that this has always been its operative rule, State points to no evidence of this interpretation prior to March 30, 2018, besides the regulations themselves. Consequently, the only evidence of State's previous position on this issue comes from COA's 2016 emails. This casts doubt on State's insistence that it had no knowledge of COA's practice of reviewing applications past expiration. While a change in administration may justify an agency's shift in policy, *see Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005), it does not provide a disclaimer of all institutional knowledge.

Nor is it dispositive that State's decision did not appear to follow a formal process. In *Navajo Nation v. U.S. Dep't of Interior*, the Ninth Circuit found the first prong of *Bennett* satisfied where the Park Service issued an "informal opinion" via email and letter to the Navajo Nation. 819 F.3d 1084, 1090 (9th Cir. 2016). The opinion stated that the agency was "required by law to complete the NAGPRA process for cultural items excavated or removed from lands within" the national monument. *Id*. Like State, the Park Service was merely "clarifying" the applicable statutory requirements, but the Ninth Circuit had "no trouble concluding that the decision . . . consummated the Park Service's decisionmaking process as to the applicability of NAGPRA." *Id*. at 1091-92. The same reasoning likely applies here.

The second prong of *Bennett* also seems to weigh in Faith's favor. If State's March 30 emails do amount to an interpretive shift, they clearly have legal consequences for Faith. While COA's deferral gave Faith a right to a final decision on the merits of its application, State's directive converting COA's deferral into a refusal robbed Faith of this right and forced them to apply all over again. This, in turn, has prohibited Faith from legally carrying out adoptions for the lengthy duration of the re-application process.

State's argument that its interpretation did not have any legal consequences because it was merely clarifying the existing law puts the cart before the horse. Regardless of whether State believes its interpretation tracks the "plain text" of the regulation (Dkt. #51, at 19), the fact remains that COA did not share this interpretation and State had not asserted it previously. COA Response, Dkt. #46, at 3-4. To allow State to avoid review of its action by simply claiming that its interpretation was correct would constitute an end-run around the judicial process, which exists precisely to assess such claims.

*Fairbanks N. Star Borough v. U.S. Army Corps of Engineers*, cited by State, does not dictate a contrary result., 543 F.3d 586, 593 (9th Cir. 2008). In *Fairbanks*, the Ninth Circuit concluded that the second prong of *Bennett* was not satisfied because the agency's decision that the plaintiff's land fell within federal jurisdiction did not affect the federal statute's underlying requirements. *Id*. at 593-94. Here, in contrast, State's interpretation of the IAA regulations determines Faith's right to a decision on the merits under those very regulations. Furthermore, even if this was a jurisdictional question, the Court has held that an agency's jurisdictional determination can satisfy the second prong of *Bennett* because it "both narrows the field of potential plaintiffs and limits the potential liability a landowner faces." *Hawkes Co.*, 136 S.Ct. at 1814. The Court observed that this was in keeping with its "pragmatic approach" to finality. *Id*. at 1815. The second prong of *Bennett* is thus likely satisfied here as well.

The APA also requires that a challenger has no other adequate remedy in court, and State argues that this requirement is not met because the IAA provides specific procedures for judicial review of adverse actions by AEs. 42. U.S.C. § 14922(c)(3). However, if State's emails to COA likely constitute a final agency action, it follows that Faith is not actually challenging an adverse action by COA at all. Rather, Faith is challenging the directive by State that transformed COA's

deferral *into* an adverse action. Indeed, Faith and COA argue that a deferral cannot lawfully be considered an adverse action because it does not meet any of the definitions in the IAA or its implementing regulations. Motion, Dkt. #20, at 13; COA Response, Dkt. #46, at 6. Consequently, Faith is likely to succeed on its claim that State's directive to COA constitutes a final agency action subject to review under the APA.

2.    *Was State's Directive Arbitrary and Capricious?*

Faith argues that State's directive to COA was an arbitrary and capricious shift in policy. *See* Dkt. #21, Ex. A, at 37-38. 22 C.F.R. § 96.63(c) grants accrediting entities "discretion" to defer decisions in order to let agencies remedy deficient applications. According to Faith, State had never previously rejected a COA deferral extending beyond the accreditation deadline, or re-classified a deferral as a refusal. *See* Schmidt Decl., Dkt. #47, at 1-3, Exs. A & B. (2016 emails between COA and State explaining COA's deferral practice). Despite suddenly changing this pattern, Faith contends that State provided little to no justification for the shift.

State responds that its directive to COA was merely a straightforward interpretation of its regulations implementing the IAA. State asserts that 22 C.F.R. §§ 96.60 and 96.63(c) preclude AEs from processing a renewal after an agency's accreditation expires at the end of the four or five year limit. State also denies that it ever had a policy of allowing COA to continue processing renewal applications after accreditation had expired, or that it was ever aware of such a practice.

Although an agency interpretation entitled to *Chevron* deference may nonetheless be found arbitrary and capricious, *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984), deference may not be applied at all where the regulation is "procedurally defective."[4] *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). A regulation may

---

[4] The Court stated that a procedural challenge to a regulation may be foreclosed in some instances, such as where an agency failed to amend a rule in light of changed circumstances. *Encino*, 136 S.Ct. at 2125 (citing *Auer v. Robbins*,

be procedurally defective if the agency failed to "give adequate reasons for its decisions." *Id.* "That requirement is satisfied when the agency's explanation is clear enough that its 'path may reasonably be discerned' . . . [but it is not met when] the agency has failed to provide even that minimal level of analysis." *Id.* (quoting *Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc.*, 419 U.S. 281, 286 (1974)). When deciding if a regulation is procedurally defective, the Supreme Court has considered whether the new regulation contradicts a "longstanding earlier position" and whether there are "serious reliance issues at stake." *Id.* at 2127.

In *Encino*, the Court held that the Department of Labor acted arbitrarily and capriciously when it reversed a decades-old policy of exempting service advisors from FLSA requirements. *Id.* at 2123. The original interpretation arose in a 1978 opinion letter and was followed by amendments to the Department's field manual. *Id.* However, when the Department finally got around to notice-and-comment rulemaking, its final rule set forth the opposite interpretation of the proposed rule with little explanation. *Id.* at 2123-24; *see also Gomez-Sanchez v. Sessions*, 892 F.3d 985, 995 (9th Cir. 2018) (holding that the Board of Immigration Appeals acted arbitrarily and capriciously by "constrain[ing] the evidence that [judges] may consider when making a particularly serious crime determination" when it had previously held that reliable evidence should not be excluded).

---

519 U.S. 452, 458–459 (1997). However, that is not the case here. The Ninth Circuit has also noted in dicta that the "procedural defect" standard from *Encino* does not apply "where the agency is not offering a policy explanation but is instead interpreting a binding regulation." *Bahr v. U.S. Envtl. Prot. Agency*, 836 F.3d 1218, 1229 (9th Cir. 2016) (citing *Auer*, 519 U.S. at 461). The court did not elaborate on this statement in *Bahr* and it is unclear to the Court why the procedural defect challenge would precede *Chevron* deference but not *Auer* deference. Fortunately, this issue need not be addressed because State's interpretation likely does not qualify for *Auer* deference because it contradicts State's past implicit interpretation and constitutes an "unfair surprise." *See infra* pp. 20-21; *Christopher*, 567 U.S. at 156. Furthermore, State's directive amounts to a new substantive rule and is not merely interpreting a binding regulation. *See infra* pp. 16-17.

State's conduct here is likely not as egregious of a departure as *Encino* and *Gomez-Sanchez*. Unlike those cases, where the agency had itself stated a contrary interpretation in the past, State never explicitly announced a policy of allowing renewal processing to extend beyond accreditation expiration. See *Encino*, 136 S.Ct. at 2123; *Gomez-Sanchez*, 892 F.3d at 995. This both lowers the justifiable reliance by private parties and diminishes the explanation necessary to support State's new position, since there is no competing logic from a past policy announcement. In addition, State's interpretation was based on the text of its regulations and did not involve fitting real-world facts into statutory definitions, as was the case in *Encino*. Consequently, State's citations to 22 C.F.R. §§ 96.63(c) and 96.77(c) in its email to COA may be more satisfactory as explanations than they would be in other situations.

Nonetheless, despite State's protestations to the contrary, its prior acknowledgements of COA's practices must have been based on a different interpretation of its regulations than the agency now presents. State's 2018 emails provide almost no textual justification for its new interpretation, much less explain why the agency decided to depart from its former position. Instead, State attempted to treat its interpretation as self-evident and consistent with past procedures, but such a nonchalant dismissal does not satisfy the APA when an agency is actually making a change. *See Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 924 (D.C. Cir. 2017) (rejecting the Forest Service's attempt to "shrug off" its change in policy when that argument "flatly defies the plain text of the official 1991 Forest Plan, repeated official agency statements, and two decades of agency practice"). Furthermore, because State did not engage in rulemaking, it was also impossible for COA, Faith, or any other private party to guess at the interpretations State may rely on. *See Encino*, 136 S. Ct. at 2126-27 (explaining that the Department relied on the interpretation from one of the comments in its final rule).

This case also involves significant reliance interests, which were a major focus of the Court's reasoning in *Encino*. *See id.* at 2126. While State's new position may not "necessitate systemic, significant changes" to AEs' procedures on the same scale as the changes to dealers' compensation plans in *Encino*, State issued its interpretation at such a time that COA was already unable to salvage Plaintiffs' applications. Consequently, COA's good-faith reliance on State's former position has already had serious costs for the agencies that rely on COA. Faith has thus shown that it is likely to succeed on its claim that State's directive was arbitrary and capricious, and has at least raised "serious questions" that go to the merits. *See Cottrell*, 632 F.3d at 1131.

3.       *Did State Fail to Engage in Required Rulemaking?*

Under the APA, an agency must engage in notice-and-comment rulemaking when it promulgates a new "substantive" rule. *Reno-Sparks Indian Colony v. U.S. E.P.A.*, 336 F.3d 899, 909 (9th Cir. 2003). Substantive rules are "those which effect a change in existing law or policy" or "impos[e] general, extra-statutory obligations pursuant to authority properly delegated by the legislature." *Id.* (internal quotation marks omitted). Substantive rules "are of general, rather than situational, application." *Flagstaff Med. Ctr., Inc. v. Sullivan*, 962 F.2d 879, 886 (9th Cir. 1992). However, the Ninth Circuit has made clear that "impact is not a basis for finding a rule not to be interpretive." *Chief Prob. Officers of California v. Shalala*, 118 F.3d 1327, 1335 (9th Cir. 1997).

"Interpretive rules, on the other hand, merely clarify or explain existing law or regulations . . . [and] instruct as to what an agency thinks a statute or regulation means." *Reno-Sparks*, 336 F.3d at 909 (internal quotation marks omitted). "Because they generally clarify the application of a law in a specific situation, they are used more for discretionary fine-tuning than for general law making." *Sullivan*, 962 F.2d at 886. Courts construe the interpretive rule exception to notice-and-comment requirements narrowly. *Id.* Finally, "[a] time-honored principle

of administrative law is that the label an agency puts on its actions is not necessarily conclusive." *San Diego Air Sports Ctr., Inc. v. F.A.A.*, 887 F.2d 966, 970 (9th Cir. 1989) (internal quotation marks omitted).

In keeping with this, couching a substantive rule in an interpretive context does not automatically make it an interpretive rule. For example, in *Linoz v. Heckler*, the Ninth Circuit ruled that the Secretary of Health and Human Services' interpretation of a Medicare provision was substantive. 800 F.2d 871, 877 (9th Cir. 1986). The Medicare Carrier's Manual covered ambulance services from a hospital which "lacks appropriate facilities" to "the nearest institution having appropriate facilities," but the Secretary informally added a section providing that transportation "'solely to avail a patient of the service of ... a physician in a specific speciality' did not make the hospital where that physician was located the 'nearest hospital with appropriate facilities.'" *Id*. The court held that the interpretation "carved out a per se exception to the rule" and "withdrew coverage previously provided." *Id*. at 877. As a result, the new manual section was a substantive rule. *Id*.

The reasoning from *Linoz* is also appropriate in this case. Like the provision in *Linoz*, which interpreted the phrase "nearest hospital with appropriate facilities" in the Carrier's Manual, State's directive interprets selected language from 22 C.F.R. §§ 96.7(a)(6), 96.60, and 96.63(c). *See id*. at 876. Also similar to *Linoz*, State's directive changed the general regulatory structure by adding expiration of accreditation as a never-before-applied basis for refusing renewal. This change withdrew COA's ability to defer decisions past the expiration of accreditation and rendered Faith unable to complete the renewal process.

State insists that its directive merely clarified the regulations, but this position is not very persuasive. As discussed *supra*, the prior practices of both COA and State relied on a different

interpretation of the relevant regulations, suggesting that State's new interpretation was not a mere clarification. Indeed, as discussed *infra*, State's interpretation is not an obvious description of the regulations' plain text. Faith is thus likely to succeed on its claim that State's directive was a substantive rule requiring notice-and-comment procedures.

*4.      Did State Violate the IAA or its Implementing Regulations?*

Faith argues that the IAA only allows State to take two direct actions with respect to an agency's accreditation: "suspension/cancellation" and "debarment." 42 U.S.C. § 14924(b) & (c). Because State's directive had the effect of terminating Faith's accreditation, Faith contends that it must be viewed either as a cancellation or debarment. Therefore, since State did not follow the required procedures for either action, State's directive violated the IAA. *See id.* Alternatively, if the directive is considered a "refusal to renew," Faith argues that State still violated the IAA and its implementing regulations because the authority to refuse renewal is expressly granted to AEs. *See* 42 U.S.C. § 14922(b)(3). State's directive thus commandeered the COA's role and also failed to satisfy the requirements for an AE to issue a refusal. *See id.*; *see also* 22 C.F.R. § 96, Subpart F (describing accreditation compliance standards); COA State Department-Approved Handbook, Dkt. #51, Ex. A, at IX(C)(2)(a).

According to State, the IAA's regulatory framework was properly promulgated under 42 U.S.C. § 14923(a)(1), which empowers the State Department to "prescribe the standards and procedures to be used by accrediting entities for the accreditation of agencies." State's directive merely describes the regulations' plain text, which states that only an "accredited agency or approved person may seek renewal." 22 C.F.R. § 96.63(b). Step one of *Chevron* is therefore satisfied and the question of agency deference need not even be addressed. *See* 467 U.S. at 842-43.

1    While State is correct that this case involves an agency's interpretation of laws it

2    administers, the law at issue is not a statute but a regulation. *See* Dkt. #51, Ex. L, at 2 (March 30,

3    2018, email from State to COA explaining 22 C.F.R. §§ 96.63(c) and 96.77(c)); Opp'n, Dkt. #51,

4    at 11-13 (providing State's interpretation of the IAA regulations). The IAA implicitly grants

5    State authority to interpret its regulations when it "monitor[s] the performance by each

6    accrediting entity of its duties under . . . the [IAA's] implementing regulations." 42 U.S.C.

7    §14924(a). State's directive is therefore entitled to the deferential standard first identified in

8    *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945) and applied more recently in

9    *Auer v. Robbins*, 519 U.S. 452, 461 (1997). *See Lezama-Garcia v. Holder*, 666 F.3d 518, 525

10   (9th Cir. 2011) (distinguishing between the application of *Seminole Rock* deference when an

11   agency is interpreting its own regulation and *Chevron* deference when an agency is interpreting a

12   statute it administers). This framework for review does not mean that Faith must relinquish its

13   arguments that State violated the IAA by issuing its directive. Such a violation would make

14   State's interpretation "inconsistent with the regulation" and thus would not receive controlling

15   weight. *Auer*, 519 U.S. at 461.

16   Although State argues in its brief that its regulations "mirror" the IAA, State's

17   interpretation rests on language that is unique to the regulations. *See* Opp'n, Dkt. #51, at 12.

18   Specifically, State relies on language from 22. C.F.R. §§ 96.60, 96.63(a) & (c), and 96.7(a)(6)

19   that elaborates on the IAA's more general requirements for the accreditation process. *Id*. at 11-

20   13; *see* 42 U.S.C. § 14923. Indeed, the statute does not even mention AEs' power to defer

21   decisions. Consequently, this is not a situation where the Court should apply *Chevron* and reject

22   *Seminole Rock* deference because the regulatory language merely parrots the statute. *See*

23   *Gonzalez v. Oregon*, 546 U.S. 243, 257 (2006).

24

1      *5.    Is State's Directive a Permissible Interpretation of IAA Regulations?*

2          Where an agency promulgates a regulation filling in a gap in a statute it enforces, "[s]uch

3   legislative regulations are given controlling weight unless they are arbitrary, capricious, or

4   manifestly contrary to the statute." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S.

5   837, 844 (1984). However, the court must "give substantial deference to an agency's

6   interpretation of its own regulations." *Nat. Res. Def. Council, Inc. v. U.S. E.P.A.,* 638 F.3d 1183,

7   1192 (9th Cir. 2011) (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)). The

8   court "must defer to the [agency's] interpretation unless an alternative reading is compelled by

9   the regulation's plain language or by other indications of the [agency's] intent at the time of the

10  regulation's promulgation." *Id.* (quoting *Shalala*, 512 U.S. at 512). "Indicia of inadequate

11  consideration include conflicts between the agency's current and previous interpretations; signs

12  that the agency's interpretation amounts to no more than a convenient litigating position; or an

13  appearance that the agency's interpretation is no more than a post hoc rationalization advanced

14  by an agency seeking to defend past agency action against attack." *Price v. Stevedoring Servs. of*

15  *Am., Inc.*, 697 F.3d 820, 830 n. 4 (9th Cir.2012) (en banc) (internal quotation marks omitted).

16         Deference may also be inappropriate where the agency's interpretation constitutes an

17  "unfair surprise." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012).

18  "[W]here . . . an agency's announcement of its interpretation is preceded by a very lengthy

19  period of conspicuous inaction, the potential for unfair surprise is acute." *Id.* at 158. This rule

20  exists to discourage agencies from promulgating "vague and open-ended regulations that they

21  can later interpret as they see fit," as well as to ensure that parties do not have to "divine the

22  agency's interpretations in advance or else be held liable." *Id.* at 158-59.

23

24

If the court finds that *Seminole Rock* deference does not apply, the agency's interpretation receives "a measure of deference proportional to the 'thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade.'" *Id*. at 159 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)); *see also Indep. Training & Apprenticeship Program v. California Dep't of Indus. Relations*, 730 F.3d 1024, 1035 (9th Cir. 2013) (applying *Skidmore* deference if *Seminole Rock* deference is inappropriate). If the agency's interpretation is unpersuasive, the court must employ "traditional tools of interpretation" to resolve the relevant question itself. *Id*. at 161.

Here, it is likely that *Seminole Rock* deference is inappropriate both because State's current position contradicts its past implicit interpretation and constitutes an "unfair surprise." Although State's March 30, 2018, emails to COA vaguely refer to 22 C.F.R. §§ 96.63(c) and 97.77(c), State had for years acquiescenced to COA's practice of processing applications past the expiration of accreditation, and even acknowledged that practice itself. *See* Decl. of Schmidt, Dkt. #47, at 1-3 (identifying eight cases since 2012 in which COA processed renewals past expiration and "communicated with the State Department about the status of the applications"), Ex. B (email from State summarizing a situation in which an agency's accreditation would lapse before it received renewal). In doing so, State implicitly embraced a different interpretation of its regulations than it now espouses; any other conclusion would involve State standing by while COA repeatedly violated its regulations.

This case presents a situation similar to *Christopher*, where an agency's sudden departure from an unspoken policy of inaction prejudiced private parties. *See* 567 U.S. at 157. In *Christopher*, the pharmaceutical industry had no time to change its practice of classifying pharmaceutical detailers as exempt employees, thus exposing companies to sudden liability. *Id*.

Here, COA had no time to alter its procedures to ensure that all applications were fully processed before expiration, thus exposing Faith to sudden refusal of its application. This case does differ from *Christopher* in the sense that the private party best positioned to change its practice (COA) is different from the party prejudiced by the action (Faith). However, COA and Faith were both caught off guard by State's interpretation, so it makes little difference how the negative effects are distributed. Consequently, *Seminole Rock* deference is likely inappropriate. *Id*. at 159.

Applying *Skidmore* deference, Faith has at least raised serious questions regarding the persuasiveness of State's interpretation. State first relies on 22 C.F.R. § 96.7(a)(6), which states that accrediting entities are responsible for "[d]etermining whether accredited agencies and approved persons are eligible for renewal of their accreditation or approval *on a cycle consistent with § 96.60.*" (emphasis added). Section 96.60, in turn, requires that accreditation shall last for a period of four years, and may be extended for "no more than one year . . . [i]n order to stagger the renewal requests from agencies . . . and to prevent the renewal requests from coming due at the same time." State also contends that § 96.63(c)'s statement that "[t]he accrediting entity must notify the *accredited* agency . . . in writing when it renews or refuses to renew an agency's or person's accreditation" implicitly requires that renewal cannot be granted after accreditation expires. § 96.63(c) (emphasis added).

However, as Faith argues, none of the provisions cited by State speak to whether an AE can continue *processing* a renewal application after accreditation expires. Section 96.63(c) likely provides the strongest support for State's position, but even this is indirect support at best. The sentence quoted by State mainly concerns notice procedures when an AE grants renewal; it only incidentally mentions that an "accredited agency" is among the parties to be notified. The use of "accredited agency" in this context was likely not intended to identify an essential requirement

for receiving renewal, but rather to describe a relevant party and differentiate them from agencies applying for the first time. Indeed, § 96.63(c) does not contain language that would indicate an exclusive list of who can receive renewal.

While § 96.7(a)(6) states that renewal applications must be handled consistent with § 96.60(b), that subsection does not say anything about when an AE may or may not continue processing an application. Rather, § 96.60(b) establishes that an agency's accreditation may only be extended to a total period of five years.[5] COA's procedures do not violate this requirement because, when an application is still being processed after accreditation expires, the agency's accreditation lapses until a final decision is reached. *See* Dkt. #47, Ex. A, at 3 (2016 email from COA to State explaining, "COA has confirmed with the Department that the regulations do not provide COA with the authority to extend an ASP's expiration if they have not completed the renewal process . . .").

Section 96.63(c)'s statement that an AE "must process the request for renewal in a timely fashion" likewise does not dictate State's interpretation. "Timely" is defined by the Merriam-Webster Dictionary as "coming early or at the right time," [6] and by the Oxford English Dictionary as "Occurring, done, or made at a fitting, suitable, or favourable time; opportune, well-timed, seasonable."[7] Timely completion of a task thus involves obtaining a positive outcome, but this only implies a strict deadline if one has been established elsewhere. Here, that

---

[5] Section 96.7(a)(6)'s language regarding considering renewal consistent with the overall accreditation cycle does suggest that AEs should not wait until an agency's accreditation is about to expire to begin the renewal process. However, the agency's lapse in accreditation at the five-year mark serves as a natural bulwark against this. Unless an agency wants to spend a lengthy period of time without the ability to conduct adoptions, it has an incentive to apply for renewal long before expiration.

[6] Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/timely (last visited Oct. 25, 2018).

[7] Oxford English Dictionary, http://www.oed.com/view/Entry/202120?rskey=mB4C4l&result=1&isAdvanced= false#eid (last visited Oct. 25, 2018).

is not the case. Section 96.63(a) states, "The accrediting entity must advise accredited agencies . . . of the date by which they should seek renewal of their accreditation . . . so that the renewal process can reasonably be completed prior to the expiration of the agency's or person's current accreditation." However, this is intended to ensure that AEs help agencies avoid a period of non-accreditation; it does not mandate a date by which AEs must finish processing. Consequently, the word "timely" should be read to require AEs to process applications expeditiously to avoid a period of non-accreditation. It does not limit AEs' discretion to defer decisions when necessary. *See* § 96.63(c).

Even if the word 96.63(a) and (c) do mandate a deadline for processing applications, this by no means suggests that AEs must abruptly refuse to renew an agency's accreditation. The section on adverse actions makes no reference to accreditation expiration as a possible basis for refusal. *See* 22 C.F.R. § 96.63(d). In contrast, § 96.10(a) requires that State "will suspend or cancel the designation of an [AE] if . . . it is substantially out of compliance with . . . the regulations implementing the IAA." Section 96.10(b) also lists timely processing as one of the "performance criteria" for designation as an AE. Given that § 96.63 describes timely processing as the AE's duty, both the plain text and common sense dictate that the AE should suffer any consequences for tardiness.

In addition to having little textual support, State's interpretation conflicts with several aspects of the IAA's overall scheme. The IAA, its implementing regulations, and the COA handbook give AEs the authority to refuse renewal and limit the grounds upon which they may do so. *See* 42 U.S.C. § 14922(b)(3) (stating that AEs have a duty to refuse renewal "for noncompliance with applicable requirements"); 22 C.F.R. § 96.63(d) (identifying four sub-sections related to evaluation procedures and substantive criteria that will "govern

determinations" about renewal); COA State Department-Approved Handbook, Dkt. #51, Ex. A,

at IX(C)(2)(a) (tracking § 96.63(d) by providing four reasons that an AE may refuse to renew an

application). No authority identifies accreditation expiration as a reason for refusal, and while it

is possible that an agency may be in non-compliance at the date of expiration, this also may not

be the case.[8] The AE's slow processing could just as easily explain the delay past expiration,[9] but

to issue a refusal for this reason would contradict the IAA's indication that a refusal be based on

the *agency's* noncompliance. *See* 42 U.S.C. § 14922(b)(3). Hemming AEs in with a strict time

limit would thus inevitably lead to AEs being both unable to grant a renewal but also unable to

refuse for an acceptable reason.[10]

State's interpretation also causes tension with the provisions of the IAA governing review

of adverse actions. The IAA provides that an agency subject to an adverse action may attempt to

get the decision set aside by the AE or a federal court. 42 U.S.C. § 14922(c)(1) & (3). However,

if the AE is not permitted to continue processing the application but also lacks sufficient

information to grant a renewal (as is likely the case if the AE deferred the decision), the refusal

---

[8] Indeed, Amazing Grace Adoptions was not scheduled to have its site visit until after its accreditation expired on March 31, 2018. Dkt. #51, Ex. L, at 2 (March 28, 2018, email from COA to State describing several agencies that would probably not receive a renewal decision before their accreditation expired). As a result, there was likely no way for COA to refuse their renewal on substantive grounds before the accreditation expiration date.

[9] In this case, the Plaintiffs expressed frustration with COA over its inability to process their applications before expiration. *See* Meske Decl., Dkt. #21, Ex. A, at 65-66; Kinley Alberes Decl., Dkt. #22, Ex. A, at 16 (accusing COA of negligently dragging on the process of renewing Adopt Abroad Incorporated's accreditation).

[10] State attempts to force its interpretation into harmony with the substantive requirements for refusal by phrasing its position in such a way that fault appears to necessarily lie with the agency seeking renewal past expiration. According to State, "the AE's decision to allow expiration of accreditation/approval because the ASP was unable to demonstrate substantial compliance prior to its expiration date constitutes a refusal to renew." Dkt. #51, Ex. L, at 2. However, if an agency was always automatically out of compliance on the date of expiration, this would defy the reasoning behind the deferral provision in the IAA regulations. *See* 22 C.F.R. 96.63(c). That subsection contemplates that there may be situations where an agency has not provided sufficient documentation to prove compliance by the scheduled decision date, but may nonetheless not conclusively be in *non*-compliance on that date. In terms of the substantive reasons underlying an AE's choice to defer, it makes no difference whether the final decision is pushed back past the expiration date or not. In both cases, the AE has judged that neither renewal nor approval are yet warranted under its governing law and procedures.

1    effectively cannot be set aside. Again, State's interpretation appears inconsistent with the IAA's

2    assumption that refusals should be issued for substantive reasons determined by the AE, not

3    procedural reasons dictated by State.

4         Finally, in addition to conflicting with the overall scheme of the IAA, State's

5    interpretation is simply illogical. It make no sense to require AEs and agencies to start all over

6    from square one when they are mere weeks away from completing the renewal process. The

7    Court can identify no good reason why the drafters of the IAA or its regulations would have

8    intended such an unnecessary waste of resources. It certainly does not benefit the children whose

9    adoptions have apparently been frustrated by State's directive. *See* Tutterrow Decl., Dkt. # 24;

10   Garrett Decl., Dkt. #25.

11        State's interpretation is unpersuasive and the traditional tools of interpretation indicate

12   that processing a renewal past the date the expiration of accreditation does not require the AE to

13   refuse the application. *See Skidmore*, 323 U.S. at 140; *Christopher*, 567 U.S. at 161. As a result,

14   the IAA does not permit State to informally instruct COA to implement this novel basis for

15   refusal. *See* 42 U.S.C. §14924(a). In short, Faith is likely to succeed on its claim that State's

16   directive constituted an impermissible interpretation of IAA regulations. *See Cottrell*, 632 F.3d at

17   1131.

18   **C.    Irreparable Harm**

19        Faith argues that it is likely to continue to suffer irreparable harm if the injunction is not

20   granted. *See Winter*, 555 U.S. at 20. According to Faith, its continued inability to conduct

21   adoptions, the money lost as a result, and the black mark of a "refusal" in its background will

22   severely affect Faith's organizational mission. In Fact, Faith argues that the delay caused by

23   applying all over again to IAAME will likely result in bankruptcy for the organization.

24

State responds with several arguments. First, State contends that Faith's delay of one and a half months before suing and another month before filing this motion suggests that there is no "urgent" need. Dkt. #51, at 25. Second, State argues that Faith's harm is self-inflicted because, if Faith had filed immediately as a new applicant to IAAME, it would be "four months closer" to re-accreditation right now. *Id*.

There is no harm more irreparable than going out of existence, and Faith has shown that this is a likely outcome if COA is not permitted to finish processing its renewal. Faith has estimated that it stands to lose hundreds of thousands in revenue annually because it is losing fees faster than overhead costs are decreasing, which will lead it to "strongly consider bankruptcy in the near future." Meske Decl., Dkt. #21, at 4; *see also* Kinley-Albers Decl., Dkt. #22, at 4-5; Kinton Decl., Dkt. # 23, at 4. State does not challenge these assertions.

Instead, State contends that these losses are self-inflicted, but this argument is unavailing. When Faith moved for an injunction, IAAME's website indicated that it had not yet "be[gun] to accredit and approve agencies and person [sic]." *See* Harvard Law School Amicus Brief, Dkt. #32-1, at 4. State contests this, asserting that IAAME began accepting new applications on March 1, 2018, has accepted a total of 11 applications to date, and plans to finish processing renewals for agencies with accreditation expiring in 2019 early in that year. Olson Decl., Dkt. #51, at 8, 19. However, even if IAAME is working on this "shorter schedule" than COA, Plaintiffs' three additional applications would presumably start at the back of the line and delay IAAME's overall schedule. In addition, given that COA took between nine and eighteen months to process new and renewal applicants, it is hard to believe that a brand-new entity with no experience will be able to greatly improve on the timetable. *See id*. at 11.

State's argument that Faith's delay in filing suit implies a lack of urgency is also unpersuasive. Faith delayed for only 48 days, whereas the plaintiff in *Lydo Enterprises, Inc. v. City of Las Vegas*, cited by State, delayed for five years. 745 F.2d 1211, 1213 (9th Cir. 1984). These situations are hardly comparable. Indeed, State's delay in responding to Faith's motion takes much of the blame for the lengthy period since Faith filed. *See* Dkt. #28. Consequently, Faith is likely to suffer irreparable injury if the injunction is not granted.

**D.      The Balance of Equities and the Public Interest**

The final factors in the preliminary injunction analysis require considering the effects of an injunction on both parties and the public. *Winter*, 555 U.S. at 24. When the government is a party, these factors merge because the government represents the public interest. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Faith argues that the equities tip sharply in its favor because an injunction would disproportionately benefit both Faith and the public, while State's interest in enforcing its directive is negligible. According to Faith, its inability to continue facilitating adoptions will diminish the resources available to prospective parents and increase the waiting line for adoptions. Further, Faith asserts that the refusal to renew its accreditation has already had consequences for families, who have had their cases put on hold for administrative review. *See* Tutterrow Decl., Dkt. # 24, at 3; Garrett Decl., Dkt. #25, at 3-4. Faith hopes renewing its accreditation may help these families complete their adoptions.

In opposition, State argues that its directive is in the public interest because it protects children and families by minimizing fraud and other misconduct during the adoption process. The IAA regulations are designed to ensure that AEs are "thorough and meticulous" when reviewing renewals, and State contends that an injunction would amount to "relax[ing]" these regulations by giving additional time to agencies that had failed to demonstrate compliance. Dkt.

1  #51, at 29-30. This, in turn, would "encourage [agencies] to take less seriously their compliance

2  obligations." *Id.* at 30.

3       State's position is quite unconvincing. As previously discussed, an agency's accreditation

4  expiring before renewal may well be the result of delays by the AE and says little about whether

5  or not the agency is actually compliant. Indeed, all three Plaintiffs in this case had been

6  accredited since 2008 and had never been refused renewal. *See* Meske Decl., Dkt. #21, at 3;

7  Kinley-Albers Decl., Dkt. #22, at 3; Kinton Decl., Dkt. #23, at 2-3. Furthermore, allowing AEs

8  the necessary time to process renewals prevents hasty decisions, thus *lowering* the risk of agency

9  misconduct. State's argument that agencies are scoffing at compliance standards because AEs

10  sometimes defer renewal decisions is both unsupported and unintuitive.

11       State is correct that the exact impact of Faith's loss of accreditation on adoptees and

12  prospective families is unclear. *See* Tutterrow Decl., Dkt. # 24, at 3; Garrett Decl., Dkt. #25, at 3-

13  4. One family previously served by Faith indicate that their case was delayed for uncertain

14  reasons after Faith lost its accreditation (Garrett Decl., Dkt. #25, at 4) and another family asserts

15  that officials told them their case was delayed partly because Faith's accreditation had lapsed.

16  Tutterrow Decl., Dkt. #24, at 3. There is no guarantee that renewing Faith's accreditation would

17  resolve these situations. However, it seems likely that letting Plaintiffs resume operations could

18  only improve the situation of adoptee families that may have come under scrutiny. Further,

19  reinstating Faith's accreditation would allow Plaintiffs to avoid bankruptcy, ensuring that the

20  expertise, resources, and connections they have built up over decades would not be wasted.

21       While it is true that the public has an interest in the government enforcing its laws, that

22  interest is only served if the government acts properly and justly. *See Nken*, 556 U.S. at 436

23  (distinguishing wrongful removal of aliens from proper removal orders). Here, it is far from clear

24

that State acted in such a way. Indeed, Faith has shown that State likely acted unlawfully in several respects by issuing its directive. As a result, the balance of equities tips sharply in favor of granting the injunction, as does the public interest.

## CONCLUSION

Faith has demonstrated that it is likely to succeed on the merits of its claims and has also raised serious questions that go to the merits. Faith has also shown that it stands to suffer irreparable harm if an injunction is not granted, that the balance of equities tips sharply in its favor, and that an injunction is in the public interest. Consequently, Faith's motion is GRANTED and the Court enjoins and suspends the effect of State's directive to COA ordering it to stop processing Plaintiffs' renewal applications and treat them as refused.

IT IS SO ORDERED.

Dated this 30th day of October, 2018.

Ronald B. Leighton
United States District Judge